524 So.2d 586 (1987)
SHARP ELECTRONICS CORPORATION
v.
Stanleigh C. SHAW, d/b/a Shaw Business Equipment, now known as Cheaha Business Machines
83-110.
Supreme Court of Alabama.
October 30, 1987.
*587 Fournier J. Gale III, Cathy S. Wright, Lee E. Bains, Jr., and James L. Priester of Maynard, Cooper, Frierson & Gale, Birmingham, and Robert D. Piliero, of Wender, Murase & White, New York City, and Andrew D. Rackear, Assoc. Gen. Counsel, Sharp Electronics Corp., Paramus, N.J., for appellants.
Andrew W. Bolt II, of Bolt, Isom, Jackson & Bailey, Anniston, for appellee.

ON APPLICATION FOR REHEARING
PER CURIAM.
The original opinion in this case is withdrawn and the following opinion is substituted in its place. On application for rehearing, appellee, Stanleigh C. Shaw, vigorously contends that this Court's statement of facts in the original opinion was incorrect in certain aspects, and that this Court would reach a different conclusion if the facts were properly stated. The office of a rehearing is to call to the Court's attention any errors of fact, as well as of law, and to provide the Court with a final opportunity to see that justice is done. This Court should stand with an open mind throughout all stages of the appellate process, including the rehearing stage. In this case, we agree with the appellee that certain inaccuracies appeared in our original opinion.

FACTS
Appellee, Stanleigh C. Shaw, attended a meeting of office machine dealers in Florida, where he first became acquainted with the photocopiers being introduced to the United States market by Sharp Electronics Corporation. There he saw the model 710 for the first time, having first gotten a pass to go to a hotel room where the machine was being demonstrated. Sharp had been marketing calculators, but had not been in the copier business prior to August 1975, when it introduced the model 710.
The Sharp 710 copier is a plain paper copier; that is, it will copy on virtually any kind of paper. For 20 years, until 1974 or *588 1975, Xerox Corporation was the only copier firm in the United States with a plain paper copier. Sharp was one of the first to enter the plain paper copier market after the Xerox patent expired.
Shaw was impressed with the good quality of the copies made by the 710, which he considered superior to the Xerox machines. At the Florida meeting, Shaw was told by the Sharp people that the machines were of good quality; that they would compete well on the open market, specifically with the Xerox 3100; and that they were capable of running up to 8,000 copies a month.
At that meeting Shaw and Phillips, Shaw's partner, decided to take the Sharp copier as another product line for their business to market in the Anniston area.
Sharp made other representations about the quality of the 710 copier in written materials furnished Shaw, which were in evidence as defendant's exhibits 4, 5, 7, and 18. After taking on the line, Shaw began marketing and servicing the Sharp copiers, relying upon the representations as to the competitive quality of these copiers that were made to him by Sharp's sales people and service people and in documents furnished by Sharp after the machines were received.
As alleged in Shaw's counterclaim, this lawsuit involves representations about three models of the Sharp photocopier. Sharp introduced model 720 as a replacement for the 710 in August 1976. The 720 was replaced by the 726 in November 1977. The model 726 was produced until December 1978.
Shaw testified at considerable length. He described the servicing of the three models and the experiences he had with his customers who owned them. Shaw said he relied upon the statements made to him about the model 710 when he first saw it, upon statements to him by Sharp's sales people and service people and upon statements made in Sharp's sales brochures, that the machines were of good quality, that they would produce without having much service, and that they would compare well with other makes of copiers. He also said that because the representations were not true, he was almost forced out of business.
Shaw identified a box of service records pertaining to Sharp copiers owned by his customers. That box was introduced into evidence as defendant's exhibit 21. Testimony also was given as to how each document in the box had been given a sequential number with the Bates numbering machine. Summaries were prepared from these service records and were used to calculate the number of service calls Shaw made for which he did not charge the owner of the copier. Using Shaw's hourly rate charge, a determination was made that Shaw's business lost $25,184.25. Defendant's exhibit 18 is a copy of those calculations.
On cross-examination, Shaw testified that it first occurred to him in the latter part of 1979, or January 1980, that Sharp's representation about the three models of the copier were not true. He said: "I think I started talking to other dealers, started buying machines through other dealers who had problems. Several of the dealers who were authorized Sharp dealers told me they had the same problem with the machines and they could not get them working. So at that time I started thinking there must be something defective about it." Shaw testified that "I would not have ordered that 726 in February 1979 if I had known that Sharp had misled me."
Over Sharp's objection, the trial court submitted to the jury both the issue of Sharp's claim of an amount due from Shaw, and Shaw's counterclaim based on misrepresentation. The jury returned a verdict in favor of Sharp for $4,224.35,[1] and in favor of Shaw on his counterclaim for $100,000.00.
*589 Suit was originally filed by Sharp Electronics on December 11, 1980, in the District Court of Calhoun County to collect a debt due on some 12 or 15 copying machines sold to the defendant, Stanleigh Shaw. The district court entered a judgment in favor of Sharp in the amount of $4,224.35, and Shaw appealed to the circuit court, where the case was tried to a jury, as previously stated. It was when this original suit on account was appealed to the circuit court that Shaw filed his counterclaim alleging fraud and misrepresentation as to the quality, serviceability, and productivity of Sharp's copiers; the fraud and misrepresentation were alleged to have occurred on August 17, 1981. Although Sharp's suit against Shaw for failure to pay his bill for copiers included claims related to several other models, the suit also included a claim for $2,111.73 for an SF 726 copier, and although Shaw, in his counterclaim, alleges that the fraud and misrepresentation occurred as to other copiers, he also claims that fraud and misrepresentation occurred as to the SF 726 copier. A copy of the invoice of Sharp Electronics Corporation to Shaw on this particular copier was, along with copies of other invoices, attached to the complaint.

Doctrine of Relation Back of Counterclaims
The doctrine of relation back is applicable under the facts in this case because when Sharp filed suit against Shaw for the unpaid debt on the copiers, it sued in regard to a copier that had been the subject of representations at the Miami conference in August 1975. The parties do not dispute the fact that Sharp's suit against Shaw for nonpayment of the account was within the statute of limitations, and, likewise, there can be no dispute that if Shaw had not filed his claim concerning the SF 726 as a counterclaim to Sharp's action, he would have been forever barred from making that claim, because it arose out of a transaction to which plaintiff's complaint related. It is of no moment that the suit related back to the sales of other copiers that may not have been part of the same transaction; it is sufficient that the subject of one of the claims was a part of the same transaction.
The problem in this case arises from our Rule 13, A.R.Civ.P., dealing with counterclaims and cross-claims. Rule 13(a) provides:
(a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim.... [Emphasis added.]
Rule 13(c) provides:
All counterclaims other than those maturing or acquired after pleading shall relate back to the time the original plaintiff's claim arose.
Rule 13(b) provides:
(b) Permissive Counterclaims. A pleading may state as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim.
According to the Committee Comments to Rule 13(c), the reason for the relation back of counterclaims was to harmonize Rule 13(c) with Title 7, § 355, Code of Alabama (1940). This statute is currently codified as Code 1975, § 6-8-84, and it provides:
When the defendant pleads a counterclaim to the plaintiff's demand, to which the plaintiff replies the statute of limitations, the defendant is nevertheless entitled to his counterclaim, where it was a legal subsisting claim at the time the right of action accrued to the plaintiff on the claim in the action.
As in the majority of American jurisdictions, Alabama case law has always applied the "indestructability-of-recoupment" doctrine. (Although a somewhat broader concept, the modern compulsory counterclaim is basically equivalent to common law recoupment. See A.R.Civ.P. 81(e).) For example, Harton v. Belcher, 195 Ala. 186, 190, 70 So. 141, 142 (1915), held:

*590 Defendant's claim sprung out of the contract between the parties and affected the considerations moving between them; it ran with the contract, so to speak, and, so far at least as it went to the consideration, as it did in the case here, defendant might rely on it without regard to the statute of limitation. So long as the contract, upon a breach of which the claim is predicated, subsists, and may be enforced, the claim itself may be pleaded in reduction, at least, of the demand on the contract; and this notwithstanding the matter of recoupment, independently considered, may be barred, not only when it is pleaded, but also when the right of action, against which it is asserted, accrued. Conner v. Smith, 88 Ala. 300, 7 So. 150 (1889) [Emphasis added.]
As to other jurisdictions, "Almost without exception the cases which deal with recoupments, so recognized and named, run to the effect that if a defendant's claim is in fact a recoupment the general statutes of limitation do not defeat it; on the contrary it may be availed of defensively so long as plaintiff's cause of action exists." Annot., 1 A.L.R.2d 666, 667 (1948) (emphasis added).
In most jurisdictions, permissive counterclaims (basically equivalent to common law setoff, A.R.Civ.P. 81(e)), do not relate back. 6 Wright & Miller, Federal Practice and Procedure § 1425, p. 135 (1971): 51 Am. Jur.2d Limitation of Actions § 78, p. 657 (1970). The original version of § 6-8-84 was enacted to give relation-back effect to setoff in addition to recoupment. In time, the statute came to be applied to recoupment as well as setoff, Tennessee Valley Cotton Oil Mill v. Oakland Gin Co., 341 So.2d 153, 156 (Ala.Civ.App.1976); thus, the 1975 recodification of the statute replaced the term "setoff" with "counterclaim" (i.e., all counterclaims, compulsory and permissive). However, the statute has never been read to alter the "indestructability of recoupment" doctrine.[2]
We admit that our cases have not clearly explained the rules of relation back of counterclaims.[3] As to our recent cases, since Campbell v. Regal Typewriter Co., 341 So.2d 120 (Ala.1976), it is not apparent from the opinions that the results of any of our cases were incorrectwe just did not adequately set out the correct rules. We take this opportunity to set the record straight.
The rules of relation back of counterclaims are simply these:
(1) Relation back is invoked only when the counterclaim would be time-barred judged from the date the counterclaim was filed.
(2) All counterclaims, compulsory and permissive, relate back. Code 1975, § 6-8-84; Rule 13(c).
*591 (3) Omitted counterclaims allowed by the court pursuant to Rule 13(f) also relate back. Rules 13(c) and 15(c). See 1 C. Lyons, Alabama Practice § 13.10, p. 224 (1986).
(4) Counterclaims relate back to the date the plaintiff's (or claimant's) action accrued. Because the statute requires the counterclaim to be "a legal subsisting claim" on the date the plaintiff's action accrued, a counterclaim that accrues after the date the plaintiff's action accrues but becomes time-barred before suit is filed cannot be used offensively, that is, to exceed the amount of plaintiff's recovery, if any.
(5) Permissive counterclaims that were not legally subsisting claims on the date the plaintiff's action accrued (e.g., claims that became time-barred earlier) are subject to a statute of limitations defense.
(6) Compulsory counterclaims that were not legally subsisting claims on the date the plaintiff's action accrued (e.g., claims that became time-barred earlier) cannot be used offensively. Such compulsory counterclaims that are still untimely under our relation back rules can be used defensively, that is, to cancel out the amount won by the plaintiff. Examples: (a) P wins $20,000 and D wins $50,000 on an untimely compulsory counterclaim. Judgment for zero, a "wash". (b) P wins $20,000 and D wins $5,000. Judgment for P for $15,000. (c) P wins $20,000 and D wins $20,000. Judgment for zero.
Our recent cases have not adequately distinguished between this offensive and defensive use of compulsory counterclaims. By quoting only half of the rule, we left the impression that all compulsory counterclaims can always be used offensively. For example, Campbell v. Regal Typewriter Co., 341 So.2d 120, 126 (Ala.1976), merely stated, "Counterclaims in the nature of recoupment are not defeated by the general statutes of limitations." Although literally true, such statements ignored the offensive/defensive distinction. This distinction applies in the majority of jurisdictions, but in almost all other states counterclaims relate back only to the date of the plaintiff's complaint. Also, most other jurisdictions do not allow permissive counterclaims to relate back at all. See J. Hoffman, Fictitious Party Practice and Relation Back of Amendments and Counterclaims, in Selected Problems in Alabama and Federal Civil Practice, Section I, published by Cumberland School of Law, The Institute for Continuing Legal Education, for a seminar on December 12, 1986.
Thus, the issue in this case is whether appellee/defendant Shaw can use his compulsory counterclaim offensively, or only defensively for the limited purpose of canceling out Sharp's $5,250.86 recovery. In other words, was Shaw's claim of fraud a legally subsisting claim at the time Sharp's breach of contract action accrued? Around 1975, Sharp made representations to Shaw about the quality and performance of Sharp's copiers. Shaw testified that it first occurred to him in the latter part of 1979, or in January 1980, that Sharp's representations about the three models of the copier were not true. Sharp filed suit against Shaw on December 11, 1980. The date of discovery of fraud is a jury issue. We restate the offensive/defensive use-of-the-counterclaim principle: Under the relation-back doctrine, Shaw's compulsory counterclaim may be used offensivelynot merely defensively as a creditif it was not time-barred on the date Sharp's cause of action accrued. There was evidence from which the jury could have determined that Shaw first discoveredor reasonably should have discoveredthe fraud no longer than one year prior to the accrual of Sharp's cause of action for breach of contract. Thus, Shaw's claim was not time-barred. Therefore, our doctrine of relation back of counterclaims would allow Shaw an offensive use of his counterclaim.

Appellant's Other Claims
In our original opinion we concluded that the facts did not justify invocation of the doctrine of relation back, and, therefore, that the statute of limitations barred Shaw's counterclaim; thus, we concluded that the judgment of the circuit court had to be reversed and a judgment rendered for *592 Sharp on Shaw's counterclaim. Having so concluded, we found it unnecessary to address Sharp's other claims of error. Now realizing that this issue is not dispositive of the litigation, we are required to address the other contentions made on this appeal.
Although Sharp has made many claims of error, they chiefly concern matters that the jury, exercising its proper authority, could rightfully resolve. Sharp makes the following claims of error:
1. That the trial court erred in failing to rule that Stanleigh Shaw suffered no injury and had no standing to bring the counterclaim because the alleged representation was not made to him personally.
2. That Shaw failed to establish the essential elements of a fraud and misrepresentation claim.
3. That Shaw failed to establish the essential elements of a fraudulent concealment claim.
4. That there was no competent evidence of actual damages suffered as a proximate consequence of Sharp's alleged fraud.
5. That this Court should reverse Shaw's judgment outright, or grant Sharp a new trial because of the inadequacy of the record.
6. That the verdict of $100,000.00 indicates bias, passion, and prejudice on the part of the jury.
As we view this case, Sharp's main contention dealt with the relation back doctrine as it applies to compulsory and permissive counterclaims. Shaw's attorneys have competently and thoroughly discussed other claims of error, but we do not believe they deserve the minute attention we have given the relation back claim. For that reason we will deal with them as they interrelate one to the other.
Sharp's first claim, that the trial court erred in failing to rule that Shaw suffered no injury because the alleged representation was not made to him personally, is not borne out by the record. The record indicates that the representation was made directly to Shaw in 1975, at a demonstration room in a hotel in Miami. Although his partner was also in Miami at the time, the evidence shows that the jury could have concluded that the representation to Shaw was personal and that it was reiterated by the mailing of literature directly to Shaw, describing the efficiency, productivity, and reliability of the SF 710, later manufactured and restyled as the 710, the 710 itself being later manufactured and restyled as the 726, which was the subject of Shaw's counterclaim. Landy v. FDIC, 486 F.2d 139, 169 (3d Cir.1973).
Next, Sharp claims that Shaw failed to establish the essential elements of a fraud and misrepresentation claim. Those elements are: (1) that a false representation was made to the plaintiff; (2) that the false representation related to a material existing fact; (3) that the plaintiff justifiably relied on the representation to his detriment and (4) that actual damages were sustained as a proximate consequence of the representation. Cecil Crews Chevrolet-Oldsmobile, Inc. v. Williams, 394 So. 2d 912, 914 (Ala.1981). We have already dealt with whether a false representation was made to the plaintiff. As to whether the representation here was merely puffery or trade talk, a matter calling for application of the doctrine of caveat emptor, or truly a representation concerning a material fact, we have said:
[Whether] a given representation is an expression of opinion or a statement of fact depends upon all the circumstances of the particular case, such as the form and subject matter of the representation and the knowledge, intelligence and relation of the respective parties. The mere form of the representation as one of opinion or fact is not in itself conclusive, and in cases of doubt the question should be left to the jury.
Fidelity & Casualty Co. of New York v. J.D. Pittman Tractor Co., 244 Ala. 354, 13 So.2d 669 (1943). Here, the facts indicated that Sharp Electronics Corporation was posturing itself to launch into a new business to compete for that business as to which Xerox Corporation had no longer a monopoly because its patent had expired.
*593 The jury had the right to look at the statement in that context, and they apparently did, finding in favor of Shaw. Furthermore, there was adequate evidence for the jury to find that in reliance on the representation Shaw purchased copiers from Sharp, and as a result incurred a detriment in the sum of $25,184.25 and was almost driven out of business. The jury, having credible testimony concerning each of the elements of fraud and misrepresentation, did not err in returning a verdict in favor of Shaw on his counterclaim.
Sharp's third contention is that Shaw failed to establish the essential elements of a fraudulent concealment claim. Section 6-5-102, Alabama Code (1975), provides:
Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.
We are of the opinion that the trial judge was right to submit, under proper instructions, the fraudulent concealment claim. As we have pointed out, Sharp was attempting to get some of the business that Xerox could not necessarily hold because its patent had expired. For a long time, Xerox had held a monopoly in this field. Where there is a knowledge on the part of one party superior to that of another, we have, in some cases, held there was a duty to communicate the facts that the party with superior knowledge might have. The claim is that Sharp represented to Shaw that the Sharp copiers were able to compete favorably with the comparable Xerox copier and even had an edge on the Xerox copier. Judge Quattlebaum was right to submit to the jury the question whether, under those circumstances, Sharp was obligated to tell Shaw that these copiers had not been tested sufficiently. See Jim Short Ford Sales, Inc. v. Washington, 384 So.2d 83, 86 (Ala.1980); First Virginia Bankshares v. Benson, 559 F.2d 1307 (5th Cir.1977).
Sharp's fourth argument is that the evidence of actual damages suffered as a proximate cause of Sharp's alleged fraud was not competent because it consisted of testimony by one of the lawyers for Shaw who sat at Shaw's counsel table; that lawyer testified that she computed the amount of actual damages from records of service calls made on defective copiers sold to Shaw by Sharp. The claim is that a lawyer cannot be lawyer, as well as witness, for his own client. However, the rule does not fit the facts of this case. There is no indication in this record that Shaw's lawyer testified to any facts that were not in evidence. Lawyers, indeed judges, can make mathematical calculations, exhibits, and the like from evidence in the record at trial, as well as on appeal, and the rule against lawyers and judges wearing two hats is not applicable. Inasmuch as the procedure utilized to arrive at the amount of actual damages is not condemned by our rules, there was competent evidence of actual damages suffered as a proximate result of Sharp's fraud.
Sharp's final contention is that the Court should reverse Shaw's judgment outright and grant it a new trial because of the inadequacy of the record. Suffice it to say that we are very much aware of the difficulties had in obtaining the record in this case. There are some gaps in the record. However, we are of the opinion that they do not materially impair our understanding of what transpired in the trial. The trial judge was of the opinion that the record was adequate. For a long time this Court superintended the preparation of the record, and we are satisfied that both sides have been adequately protected. For these reasons, we reject appellant's contention with reference to the record.
Because Sharp's motion for remittitur was denied without an opinion or findings of fact, we remand this cause for reconsideration of the issue of excessiveness, pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986). See, also, Harmon v. Motors Insurance Corp., 493 So.2d 1370 (Ala.1986); Alabama Farm Bureau Mutual Casualty Insurance Co. v. Griffin, *594 493 So.2d 1379 (Ala.1986). The trial court, within its discretion, may order a further hearing on the remittitur issue, or may comply with this order without a further hearing. In any event, the trial court shall report its findings and conclusions to this Court within 28 days of the issuance of this opinion.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION GRANTED; AFFIRMED IN PART; AND REMANDED WITH INSTRUCTIONS.
JONES, ALMON, ADAMS and HOUSTON, JJ., concur.
TORBERT, C.J., concurs specially.
MADDOX and BEATTY, JJ., dissent.
SHORES, J., recused.
STEAGALL, J., not sitting.
TORBERT, Chief Justice (concurring specially).
I agree that the application for rehearing should be granted, and I agree with the action taken on rehearing. However, in my opinion, the particular circumstances of this case, while sufficient to establish a duty to disclose in connection with the fraudulent concealment claim, do not establish the existence of a confidential relationship.
MADDOX, Justice (Dissenting).
I am of the opinion that the counterclaim in this case should have been dismissed for several reasons, but I list the two primary ones:
(1) It did not arise out of the same transaction giving rise to the underlying suit; therefore, it was at most a permissive counterclaim rather than a compulsory one, and was time barred.
(2) The counterclaimant failed to prove each and every element of his fraud claim.
This case started out in district court as a suit on an account. Sharp sued Shaw for money due on account for copiers he had bought and not paid for, and one of those was a model 726. Sharp won in the district court, but Shaw appealed to the circuit court, filed a counterclaim for fraud, and claimed that Sharp made representations to him in 1975 about the quality of a model 710, a different model from that sued on, and even though he was a member of a partnership at that time. That partnership was dissolved, and he was in business by himself at the time he entered into the sales contract out of which the original suit arose. He had bought the 726 model, on which the suit on the account was based, in 1979, but he claimed that the original representation made to him about the model 710, continued through two model changes, and over a 4-year-period of time, a change of business, and all after he knew that the copiers were not as represented, because he allegedly lost $25,000 as a result of having to service the copiers which were bought in the meantime by the business entities involved.
The majority is of the opinion that the alleged representation made to Shaw about the 710 copier in 1975 was made to him "personally," and not to the business which actually purchased the machines. The majority is also of the opinion that the subsequent model changes and the dissolution of the partnership and the starting of a proprietorship by Shaw is of no legal consequencethat it was a continuing representation to Shaw "personally." I cannot so interpret the facts and the law applicable. I believe the majority errs in reaching these conclusions.
I will set out the facts from Shaw's initial brief on appeal to show why I am of the opinion that Sharp's claim, which was based on the 1979 open account with Shaw, and Shaw's counterclaim, which was based on alleged "continuing misrepresentations that Sharp made to Shaw in 1974, and made to him continuously through 1979," arose out of separate and distinct transactions or occurrences, and that many of the copiers were not purchased by him but by a corporation or partnership for which he worked, and, therefore, were not compulsory counterclaims as the majority holds.
*595 Shaw's own version of the facts is, as follows:
"The appellee, Stanleigh C. Shaw, was employed by the Birmingham office equipment dealer, P & S Business Machines, Inc., in the early 1970's. Shaw left Birmingham and went to Anniston where he continued in the office machines business in a partnership with Steven Phillips, the owner of P & S Business Machines, Inc.
"Sharp and Phillips entered into a written partnership agreement on March 15, 1974, that was dissolved in August, 1978.
"While a member of the partnership, Shaw attended a meeting of office machine dealers in Florida where he first became acquainted with the photocopiers being introduced to the U.S. market by Sharp Electronics Corporation. There he saw the model 710 for the first time having first gotten a pass to go to a hotel room where the machine was being demonstrated. Sharp had been marketing calculators but had not been in the copier business prior to August 1975, when it introduced the model 710.
"The Sharp 710 copier is a plain paper copier; that is, it will copy on virtually any type of paper. For twenty years until 1974 or 1975, Xerox Corporation was the only copier firm in the United States with a plain paper copier. Sharp was one of the first to enter the plain paper copier market after the Xerox patent expired.
"Shaw was impressed with the good quality of the copies made by the 710, which he considered superior to the Xerox. At the Florida meeting Shaw was told the machines were of good quality; that they would compete well on the open market, specifically with Xerox 3100, and that they were capable of running up to 8,000 copies a month.
"At that meeting, Shaw and Phillips decided to take the Sharp copier as another product line for their business to market in the Anniston area.
"Sharp made other representations about the quality of the 710 copier in written materials furnished Shaw, which are in evidence as Defendant's Exhibits 4, 5, 7 and 18. After taking on the line, Shaw began marketing and servicing Sharp copiers, relying upon the representations as to the competitive quality of those copiers, which were made to him by Sharp sales people and service people, and in documents furnished by Sharp after the machines were received.
"As alleged in the counterclaim, this lawsuit involves representations about three models of the Sharp photocopier. Sharp introduced model 720 as a replacement for the 710 in August 1976. The 720 was replaced with the 726 in November 1977. The model 726 was produced until December 1978. At the time of trial in 1983, Sharp had in the market place its models 740, 741, 750, 770, 771, 781 and 811.
"When the partnership dissolved Shaw continued in the office equipment business in Anniston under the name of Shaw Business Equipment and later changed that name to Cheaha Business Machines. Sharp issued to Shaw Business Machines a certificate dated February 15, 1980, naming it a Sharp Authorized Dealer.
"* * *
"Shaw testified at considerable length. He described the servicing of the three models and the experiences he had with his customers who owned them. Shaw said he relied upon the statements made to him about the model 710 when he first saw it, statements made to him by Sharp sales people, Sharp service people, and sale brochures that the machines were of good quality, that they would produce without having much service, and that they would compare well to other makes of copiers. And he said because their representations were not true, he was almost forced completely out of business.
"Shaw identified a box of service records pertaining to Sharp copiers owned by his customers. That box was introduced into evidence as Defendant's Exhibit 21. Testimony was given as to how each document in the box had been given a sequential number with a Bates numbering machine. Summaries were *596 prepared from those service records and used to calculate service calls Shaw made for which he did not charge the owner of the copier. Using the hourly rate Shaw charged, a determination was made that Shaw's business lost $25,184.25. Defendant's Exhibit 18 is a copy of those calculations.
"Attached to the complaint Sharp filed in the district court there are orders from Shaw Business Machines to Sharp. At CR 5-F there is an order dated February 20, 1979, from Shaw for a Model 726. On cross-examination, Shaw testified that it first occurred to him in the latter part of 1979 that Sharp's representations about the three models of the copier were not true. He said, `I think I started talking to other dealers, started buying machines through other dealers who had problems. Several of the dealers who were authorized Sharp dealers told him they had the same problem with the machines and they could not get them working. So, at that time, I started thinking there must be something defective about it.' Shaw would not have ordered that 726 in February 1979 if he had known then Sharp had misled him." (Emphasis added.)
Shaw's own statement of the facts, in my opinion, shows that he was a partner in a partnership when the first alleged representation was made to him, and it concerned a model 710, not a model 726, the model sued on. Furthermore, I am of the opinion that the evidence clearly shows that Shaw did not "personally" purchase the first machines from Sharp. Those machines were purchased by a different business entity which Shaw was associated with as an agent or partner. When Shaw purchased the machine sued upon, he was in business for himself; the partnership had been dissolved, and he had, by his own testimony, experienced much trouble with the Sharp machines which had been purchased by the business entities with which he was associated. Not until he was sued on account did he press a claim for an alleged misrepresentation which occurred several years before concerning other models sold by Sharp, not to Shaw "personally," but to other entities for which he worked as an agent or partner. Under this set of facts, can the counterclaim possibly arise out of the same transaction? I think not, and the majority errs by granting rehearing and affirming the judgment, even conditionally.
The disagreement between me and the majority is the same one which exists between the partieswas the counterclaim a permissive or a compulsory one? I think it was merely permissive, even assuming the claim belonged to Shaw, because he was not the purchaser of the first machines, as I read the undisputed evidence.
The positions of the parties are stated in their briefs.
Sharp argues, inter alia:
"The critical distinction between Sharp's dealings with the P & S Corporation and P & S Partnership from 1975 to 1978 and its subsequent dealings in 1979 with Stanleigh Shaw establishes that the counterclaim is merely permissive and not compulsory. A counterclaim is treated as compulsory only when it arises out of `the same transaction' giving rise to the plaintiff's cause of action. This Court has drawn a precise distinction between the two types of counterclaims, declaring that a compulsory counterclaim differs, `mainly in that the claim must grow out of the same transaction which furnishes the cause of action, and is in the nature of right to reduce the amount demanded.' Campbell v. Regal Typewriter Co., Inc., 341 So.2d 120 (1976). By definition, then, compulsory counterclaims only concern the mutual rights and obligations of parties to a single action.
"The antithesis of this `same transaction' test occurs when parties sue on two separate contracts. In Fidelity-Phenix Fire Ins. Co. v. Murphy, [226 Ala. 226, 231-2] 146 So. 387, 391 (1933), this Court treated a counterclaim as a set-off on the basis of separate contracts:
"`The plea claims for the deceit of plaintiff ... relating to an entirely different contract from that here involved. *597 That transaction was an insurance policy on the ship, and was a different contract from the indemnity contract which is the foundation of the action in this case. True, they were related, but separate and distinct.... It is not therefore a matter in recoupment, but of set-off.'

"See Robinson Brothers & Co. v. Tygart Steel Products Co., 9 F.R.D. 468 (D.C. Pa.1949) (counterclaim permissive because complaint and counterclaim concerned separate steel shipments); McKnight v. Halliburton Oil Wells Cementing Co., 20 F.R.D. 563 (D.C.W.Va. 1957). Another indicium of a set-off is the disparity of evidence necessary to support the two claims in dispute. Maxcy v. Twilley, 289 Ala. 681, 685, 271 So.2d 243 (1972) (`In set-off there is introduced outside and new controversies wholly unrelated perhaps to the original suit').
"Sharp's claim, which was based on a 1979 open account with Shaw, and Shaw's counterclaim, which was posted on the claimed fraudulent sale of copies to P & S Corporation, arise out of two separate contracts. Additionally, the claims are based on entirely distinct factual situations. Shaw's counterclaim is therefore a mere set-off which only relates back to July 31, 1979, the date Sharp's claim came into existence.
"In order for Shaw's counterclaim to have been legally subsisting at that time, Shaw must have had no knowledge of facts before July 31, 1978, which upon closer examination would have led to the discovery of the fraud. As set forth in the Statement of Facts, Shaw clearly obtained the requisite knowledge before that time."
Shaw counters, and argues, in brief, as follows:
"The evidence in this case shows that Sharp initiated the litigation by filing suit against Shaw on an account that dates back to early 1979.
"The last sentence of Rule 13(c) of the Alabama Rules of Civil Procedure provides:
"`All counterclaims other than those maturing or acquired after pleading shall relate back to the time the original plaintiff's claim arose.'
"According to the Committee Comments to the Rule, the inclusion of this relation back of counterclaims was to harmonize with Title 7, § 333, Code of Alabama (1940), [which] provides:
"`When the defendant pleads a set-off to the plaintiff's demand, to which the plaintiff replies the statute of limitations, the defendant is nevertheless entitled to his set-off, where it was a legal subsisting claim at the time the right of action accrued to the plaintiff on the claim in suit.'
"The significance lies in the distinction between the plea of recoupment and the plea of set-off. A claim of recoupment must arise out of the same transaction which furnishes the plaintiff's cause of action. A claim of set-off is a claim independent of the transaction from that which gives rise to the plaintiff's claim. Grisham v. Bodman, 111 Ala. 194, 20 So. 514 (1896).
"Shaw was causing Sharp copiers to be purchased for resale and parts with which to service Sharp copiers he was servicing. Shaw was making those recommendations and servicing the machines in reliance upon false representations made by Sharp to him with respect to the copier models 710, 720, and 726. When Shaw took those actions, he was relying upon the false representations made by and on behalf of Sharp beginning with its introduction of the model 710 and throughout the time Shaw and Sharp did business.
"According to 37 Am.Jur.2d Fraud and Deceit § 242 at 322:
"`Representations continue to be operative where, on a fair construction of the arrangements between the parties, one of them is to be entitled to rely upon a certain representation until he receives notice to the contrary. Likewise, representations will continue in effect where they are made with a view to be relied upon in the future. Also, a representation made without *598 any restrictions has been regarded as continuing.'
"Shaw's claim for fraud was subsisting at the time Sharp's claim arose for Shaw's failure to pay the account. Shaw's counterclaim is a claim of recoupment and the general statutes of limitation do not apply, contrary to Sharp's argument in its brief. See, Annot., 1 A.L.R.2d 630 (1948), `Claim barred by limitation as subject of set-off, counterclaim, recoupment, cross bill or cross action.'
"Sharp's brief cites but fails to distinguish this Court's holding in Campbell v. Regal Typewriter Co., 341 So.2d 120 (Ala.1976). The trial court there was reversed for charging the jury on the one-year statute of limitations as being applicable to a counterclaim for fraud. That holding persuaded Judge Quattlebaum to correctly reject Sharp's statute of limitations defense [in this case]."
This Court discussed recoupment and set-off in a similar case, Campbell v. Regal Typewriter Co., 341 So.2d 120 (Ala.1976), as follows:
"Campbell asserts here that the counterclaims for fraud are not subject to the one-year statute of limitation. The last sentence of ARCP 13(c) provides: `All counterclaims other than those maturing or acquired after pleading shall relate back to the time the original plaintiff's claim arose.' According to the Committee Comments, the inclusion of this relation back of counterclaims was to harmonize with Title 7, § 355, Code, which provides:
"`When the defendant pleads a set-off to the plaintiff's demand, to which the plaintiff replies the statute of limitations, the defendant is nevertheless entitled to his set-off, where it was a legal subsisting claim at the time the right of action accrued to the plaintiff on the claim in suit.'
"The significance lies in the distinction between recoupment and set-off. Alabama law is consistent with the statement in City of Grand Rapids, Mich. v. McCurdy, 136 F.2d 615, 619 (6th Cir. 1943):
"`... Recoupment differs from set-off mainly in that the claim must grow out of the same transaction which furnishes the plaintiff's cause of action, and is in the nature of a claim of right to reduce the amount demanded. Recoupment goes to the justice of the plaintiff's claim, while set-off is not necessarily confined to the justice of such particular claim....'
"See Norton v. Bumpus, 221 Ala. 167, 127 So. 907 (1930); Walker v. McCoy, 34 Ala. 659 (1859); and Mauldin, Montague & Co. v. Armistead, Ex'r, 14 Ala. 702 (1848).
"A counterclaim in the nature of a set-off is subject to applicable statutes of limitation in accordance with Title 7, § 355, supra, as per ARCP 13(c), supra. Counterclaims in the nature of recoupment are not defeated by the general statutes of limitation. See Annot., 1 A.L. R.2d 630, 666 (1948)." (Emphasis added.)
Campbell v. Regal Typewriter Co., 341 So.2d at 126.
On rehearing, Shaw, in brief, argues:
"In making purchases of the flawed copiers from Sharp, Stan Shaw relied upon the continuing misrepresentations that Sharp initially made to Shaw in 1974 and made to him continuously through 1979. Statements made to induce a sale are, in the absence of any restrictions, operative as to future sales of like commodities between the same parties. Goldsmith v. Stern (Sup.App.) 84 N.Y.S. 869 (1903). The effect of a deceit continues until discovery of the true facts. Anderson v. Tway, 143 F.2d 95, 101 (6th Cir.1944). Had Stan Shaw known he had been misled by Sharp, he would not have continued to make purchases. Stan Shaw was acting under Sharp's misrepresentations when he ordered the SF-726 copier from them on February 22, 1979; Sharp sued for the cost of this machine in its original District Court complaint; and Shaw counterclaimed due to this machine. Clearly, that is a single transaction *599 for purposes of the relation back doctrine under ARCP 13(c)." (Emphasis added.)
I believe the evidence shows that the initial sales by Sharp were not made to Shaw "personally;" consequently, the transactions, in my opinion, do not involve "the same parties."
Shaw contends that the Campbell v. Regal Typewriter Co. case supports his argument. I must respectfully disagree.
A casual reading of the Campbell v. Regal Typewriter case shows that there was one agreement executed by and between the same parties to the lawsuit. The factual situation there is far different from the one here. This case is more like this Court's case of Fidelity-Phenix Fire Insurance Co. v. Murphy, 226 Ala. 226, 146 So. 387 (1933).
In Fidelity-Phenix Fire Insurance Co. v. Murphy, 226 Ala. 226, 146 So. 387 (1933), plaintiff's steamboat, the Rose Murphy, along with its cargo, was lost at sea. Plaintiff sought to recover the cost of the lost cargo based on an indemnity contract with the defendant insurance company. The insurance company defended, claiming that it was not liable because the plaintiff intentionally sank the ship in order to recover under a separate insurance contract the defendant had issued against the loss of the ship itself. The insurance company also claimed damages because of money it had paid on the lost ship. This Court stated:
"Plea 7 claims damages for deceit and avers that the claim is in recoupment, upon the idea, we assume, that in such a plea, different from set-off, defendant is not confined to a claim `not sounding in damages,' upon the authority of our cases defining the character of claims available by way of recoupment. Hatchett v. Gibson, 13 Ala. 587; Grisham v. Bodman, 111 Ala. 194, 20 So. 514; Brown v. Patterson, 214 Ala. 351, 108 So. 16, 47 A.L.R. 1093; 37 Corpus Juris 435.
"But it is always immaterial what the plea denominates its character, for that is determined by its substantive features.
"Neither a plea of set-off nor recoupment is now treated as inherently confessing plaintiff's claim. Section 10180, Code [(1923)].
"Section 10179, Code, does not enlarge the class of claims which may be pleaded in recoupment. To support a plea in recoupment, the defendant must claim damages, either for the breach by plaintiff of the contract sued on, or of some duty which the law imposes by virtue of such contract. Standard Sanitary Mfg. Co. v. Benson Hardware Co., 225 Ala. 412, 143 So. 570; Craft v. Standard Acc. Ins. Co., 220 Ala. 6, 123 So. 271.
"The plea claims for the deceit of plaintiff in procuring money by false representations relating to an entirely different contract from that here involved. That transaction was an insurance policy on the ship, and was a different contract from the indemnity contract which is the foundation of the action in this case. True, they were related, but separate and distinct.
"By the alleged fraud asserted in plea 7, plaintiff procured from defendant a sum of money in settlement of the claim of plaintiff against defendant on account of the loss of the ship owned by plaintiff, against the loss of which defendant had made a contract of insurance, separate and distinct from that sued on. Such settlement and payment to plaintiff was not the breach by plaintiff of the contract sued on, nor of a duty which the law imposes by virtue of such contract. It is not therefore matter in recoupment, but of set-off, and must be measured by the rules which apply to a set-off."
Fidelity-Phenix Fire Insurance Co. v. Murphy, 226 Ala. at 231-32, 146 So. at 391 (1933).
I believe that the facts of this case are more analogous to those in Fidelity-Phenix Fire Insurance Co. v. Murphy, supra.
There is an additional reason why this Court should not affirm any judgment against Sharp on Shaw's counterclaim. The elements of a fraud and misrepresentation claim are: (1) a false representation made to the plaintiff; (2) the false representation *600 related to a material existing fact; (3) the plaintiff justifiably relied to his detriment on the representation; and (4) actual damages were sustained as a proximate consequence and result of the representation. The majority cites Cecil Crews Chevrolet-Oldsmobile, Inc. v. Williams, 394 So.2d 912 (Ala.1981) in support of that legal proposition. That case involved a sale of an automobile. Suffice it to say that this case was not a transaction involving the sale of an automobile by a dealer to a customer (one transaction), but involved dealing between a manufacturer and distributor with different business entities. The majority then holds that "[a]s to whether the representation here was merely puffery, trade talk, or a matter of caveat emptor, ..." (emphasis added) depended on the facts and circumstances of this particular case. I agree that whether something is "puffery" depends on the facts of each case, but I fail to see how a claim by one photocopy maker that its product will outdo a competitor's is other than puffery and trade talk. Our whole economic system of free enterprise is based, in part, on claims made in brochures and advertising and statements by salesmen that one product is better than the other. The bargaining position between a car dealer and a customer, as in Crews, relating to one transaction is different from what we have here.[1]
In a proper case, a fraud action could lie, but I do not believe it did here.
Based on all of the above reasons, I must respectfully dissent.
NOTES
[1] Sharp filed a post-trial motion to correct the judgment in its favor by adding interest of $1,026.51 to the amount of the jury's award. The trial court granted this motion and corrected the judgment to read "$5,250.86," which reflects the accrued interest on the debt. Shaw does not question the propriety of this judgment on appeal, and we therefore allow it to stand without discussion.
[2] At common law, a defendant could not have an offensive recovery on his recoupment claim. The defendant's recoupment recovery could not exceed plaintiff's recovery; defendant could use any recovery only up to the amount of plaintiff's recovery. In effect, recoupment was only an affirmative defense, and statute of limitations issues would not arise. Relation back doctrines became necessary when statutes altered common law rules and allowed affirmative recoveries under counterclaims. As to affirmative recoveries, see Code 1975, §§ 6-8-85, -86, originally enacted in the nineteenth century.

In any case, defendant was allowed at least defensive use of recoupment. This common law rule is still in our lawwe have referred to it as the "indestructability of recoupment" doctrine. Setoffs (now permissive counterclaims) did not relate back at common law; thus, an untimely setoff could not be used offensively. An untimely setoff could not be used defensively either, because setoff is not in the nature of a defense, as is recoupment. See Harwell v. Steel, 17 Ala. 372, 373 (1850).
A statute was required in order to grant relation-back effect to setoff. Our present § 6-8-84 was enacted on February 19, 1867. 1866-67 Acts of Alabama, No. 631, p. 676. The original act was entitled, "For the allowance of offsets in certain cases where statute of limitation is pleaded." This statute did not intend to alter the "indestructability of recoupment" doctrine, nor did it intend to allow at least defensive use of setoffs that were not legally subsisting claims on the date the plaintiff's claim accrued. See generally, Annot., "Claim Barred by Limitation as Subject of Setoff, Counterclaim, Recoupment, or Cross Bill," 16 A.L.R. 326 (1931).
[3] Neither have opinions of the Court of Civil Appeals been entirely accurate. See Adams v. Coblentz G.M.C. Truck Sales, a/k/a Coblentz G.M.C. Freightlines, Inc., 506 So.2d 1023 (Ala. Civ.App.1987).
[1] This Court just recently released an opinion which held, as a matter of law, that the following statement a client testified a lawyer made to him, was not due to be relied upon:

"So, I asked Mr. Lawson, I said, `Mr. Lawson, you told me that if Lanny was out of the way you could get it into court, and you told me what all he has done wrong and all, but I am not going to fire him, not until you tell me whether or not you can get my case into court,' and he said, `Dewayne, I will promise you I can get it into court. I have done talked to the Judge, and I will promise you a million dollars, your part,' and he said, `It will not be no year or two like you have been having to wait.'"
Lawson v. Cagle, 504 So.2d 226 (Ala.1987).