859 So.2d 1096 (2002)
EXXON CORPORATION
v.
DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES et al.
1001053.
Supreme Court of Alabama.
December 20, 2002.
Order Overruling Rehearing Applications April 11, 2003.
*1099 David R. Boyd and W. Joseph McCorkle, Jr., of Balch & Bingham, L.L.P., Montgomery; Sam C. Pointer, Jr., and M. Christian King of Lightfoot, Franklin & White, L.L.C., Birmingham; Joseph C. Espy III and Suzanne D. Edwards of Melton, Espy, Williams & Hayes, P.C., Montgomery; William D. Scruggs and E. Allen Dodd, Jr., of Scruggs, Dodd, Dodd & Bazemore, Attorneys, P.A., Fort Payne; and Walter E. Dellinger, John F. Daum, and Charles C. Lifland of O'Melveny & Myers, L.L.P., Washington, D.C., for appellant.
Charles J. Cooper, deputy atty. gen., and Vincent J. Colatriano, Hamish P.M. Hume, and Derek L. Shaffer of Cooper & Kirk, P.L.L.C., Washington, D.C.; William H. Pryor, Jr., atty. gen.; Charles W. Gamble, deputy atty. gen., Tuscaloosa; John T. Crowder, deputy atty. gen.; and Robert T. Cunningham, Jr., Richard T. Dorman, David G. Wirtes, Jr., and George M. Dent of Cunningham, Bounds, Yance, Crowder & Brown, L.L.C., Mobile, for appellees.
*1100 Sally S. Reilly, Birmingham, for amicus curiae American Corporate Counsel Association.
Mike Moore, atty. gen., Mississippi; John Cornyn, atty. gen., Texas; W.A. Drew Edmondson, atty. gen., Oklahoma; Richard P. Ieyoub, atty. gen., Louisiana; Richard Blumenthal, atty. gen., Connecticut; Thomas J. Miller, atty. gen., Iowa; Frankie Sue Del Papa, atty. gen., Nevada; Patricia A. Madrid, atty. gen., New Mexico; Mark Barnett, atty. gen., South Dakota; Mark L. Shurtleff, atty. gen., Utah; Darrell V. McGraw, Jr., atty. gen., West Virginia; and Anabelle Rodriguez, atty. gen., Commonwealth of Puerto Rico, for amici curiae states of Mississippi, Texas, Oklahoma, Louisiana, Connecticut, Iowa, Nevada, New Mexico, South Dakota, Utah, and West Virginia, and the Commonwealth of Puerto Rico.
PER CURIAM.
This case involves an adverse judgment against Exxon Corporation regarding royalty payments it owes the Alabama Department of Conservation and Natural Resources ("DCNR") for gas Exxon extracted from Mobile Bay. The jury awarded the State $87.7 million in compensatory damages and $3.42 billion in punitive damages on breach-of-contract and fraud claims. We reverse and remand.

I. Factual Background
Mobile Oil Company discovered oil in Mobile Bay in 1979. In 1981, DCNR began a major sale of oil leases in Mobile Bay. In preparation for the sale of the leases, DCNR performed a comprehensive review of its standard lease agreement, and its chief legal counsel, Robert Macrory, drafted a new standard oil-and-gas form lease agreement for DCNR. DCNR awarded seven leases to Exxon in 1981. In 1984, using the same standard lease forms, DCNR awarded Exxon 15 more leases. Exxon paid the State an initial price of approximately $585 million for all of its leases in Mobile Bay.
In mid-1993, when Exxon was completing construction of its infrastructure at the drilling sites in Mobile Bay and preparing to shift responsibility of the Mobile Bay project to its operations division, R.J. Mertz, Exxon's accounting manager on the Mobile Bay project, asked Exxon's in-house counsel Charles Broome to perform a legal analysis of the royalty provisions of the lease agreement "to ensure that royalties were paid in accordance with the terms of the mineral lease" and to evaluate potential areas of cost recovery for Exxon in the production and treatment process. Broome offered three different interpretations of the lease language concerning the payment of royalties, along with the likelihood of success of each interpretation in litigation. Using his analysis, R.J. Kartzke, the Mobile Bay project manager and Broome's chief supervisor; Mertz; and other Exxon executives adopted an interpretation of the lease and began paying DCNR royalties based upon that interpretation after production began that year.
In 1996 DCNR hired outside auditors to audit Exxon's royalty payments. When the audit was completed, DCNR made a demand for reimbursement, plus interest, of what it alleged were millions of dollars in royalties that, it said, according to the royalty provisions in the lease agreement should have been paid but were not. Exxon refused to pay, and DCNR officials informed Exxon that the State was planning to sue to recover the royalty payments. Soon after, on July 28, 1999, Exxon filed a declaratory-judgment action to determine the rights of the parties under the lease agreement. The next day, the State filed a separate action against Exxon, alleging breach of contract and fraud; it later dismissed *1101 that complaint and brought the same claims as compulsory counterclaims in Exxon's declaratory-judgment action. The trial court granted the State's motion to realign the parties, and the State became the plaintiff and Exxon the defendant.
The State presented its evidence of the purported breach of contract and fraud, while Exxon maintained throughout trial that the entire case simply involved a disagreement over the interpretation of ambiguous provisions in the lease agreement. The jury returned a verdict in favor of the State, finding Exxon liable for breach of contract and fraudulent underpayment of royalties, awarding both compensatory and punitive damages. Exxon filed a motion for a hearing on the excessiveness of the punitive-damages award based on § 6-11-23, Ala.Code 1975, and in accordance with Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986). The trial court concluded that the jury's award was not excessive based upon the potential harm Exxon's behavior could have cost the State and the need to impose a stiff punishment that would serve as an effective deterrent to underpaying in the future by a large corporation such as Exxon.
Exxon appeals, challenging the sufficiency of the evidence on the issue of fraud, the availability of a fraud claim in light of the statute of limitations, the propriety of the State's receiving a punitive-damages award, several rulings by the trial court at trial, and the punitive-damages award, based upon standards set forth by the United States Supreme Court, Alabama statutes, and this Court.

II. Analysis
Exxon first argues that the two-year statute of limitations for a fraud action (Ala.Code §§ 6-2-3 and 6-2-38(l)) bars the State's fraud counterclaim. Exxon contends that the statutory limitations period on the State's fraud counterclaim had run when Exxon's declaratory-judgment action was filed in July 1999. The State responds by stating that its counterclaim is compulsory and, therefore, as this Court held in Romar Development Co. v. Gulf View Management Corp., 644 So.2d 462, 470-73 (1994), a compulsory counterclaim is not subject to the defense of limitations. Exxon answers this argument by citing Ala.Code 1975, § 6-8-84, which provides:
"When the defendant pleads a counterclaim to the plaintiff's demand, to which the plaintiff replies the statute of limitations, the defendant is nevertheless entitled to his counterclaim, where it was a legal subsisting claim at the time the right of the action accrued to the plaintiff on the claim in the action."
Exxon claims that the State conceded at the trial level that Exxon could have gone to court to obtain a declaration of its contractual royalty obligations as early as 1988 or 1989. Exxon also asserts that the earliest point at which the State could have asserted a fraud claim was December 1993, when Exxon made its first royalty payment. Exxon concludes that because the fraud claim accrued after Exxon's claim for declaratory judgment accrued, the fraud claim was not a "legally subsisting claim" within the meaning of § 6-8-84 at the time Exxon's claim accrued; therefore, it argues, the statute of limitations bars the State's fraud claim.
In support of this argument Exxon cites Sharp Electronics Corp. v. Shaw, 524 So.2d 586 (Ala.1987), in which this Court held that when a counterclaim accrues after the date of the accrual of the plaintiff's action, but becomes time-barred before the plaintiff's action is filed, the counterclaim cannot be used offensively, i.e., it cannot exceed the amount of the plaintiff's recovery, if any. Sharp, 524 So.2d at 591.
*1102 However, this reading of § 6-8-84 and the Sharp rule are in contravention to the holding in Romar, which expressly overruled Sharp. In Romar, this Court ruled that all compulsory counterclaims, whether offensive or defensive, are not subject to the statute-of-limitations defense. The trial court denied the statute-of-limitations defense on the basis of Romar, and the State insists that we should as well. Exxon asks us to overrule Romar. The State contends that Exxon waived this argument by failing to preserve it in the trial court.
Yet, even if we elected, as Exxon urges, to overrule Romar and follow the Sharp rule, whether Exxon's limitations argument would entitle it to a summary judgment or a judgment as a matter of law is problematic. If we were to apply Sharp, as Exxon insists, we would have to agree with Exxon that the statutory period of limitations on the State's claim for fraud had run, as a matter of law, as of July 1999 when Exxon filed its declaratory-judgment action. The State contends that the fraud was ongoing until shortly before the trial.
Even if we were satisfied that the issue had not been waived, Exxon faces the formidable hurdle of stare decisis in its effort to obtain what might, even under Sharp, be at best a jury determination on the limitations defense. We note at the outset that we are not here dealing with a constitutional issue where the doctrine of stare decisis is often given diminished deference. See, e.g., Marsh v. Green, 782 So.2d 223, 232 (Ala.2000). As Justice Somerville observed in his dissent in Bolden v. Sloss-Sheffield Steel & Iron Co., 215 Ala. 334, 340, 110 So. 574, 580 (1925), "The doctrine of stare decisis, though not without its limitations, is the only thing that gives form, and consistency, and stability to the body of the law. Its structural foundations, at least, ought not to be changed except for the weightiest reasons." In Lindsay v. United States Savings & Loan Ass'n, 120 Ala. 156, 167, 24 So. 171, 174 (1898), this Court commented:
"The observations of Chancellor Kent are instructive, and have been often quoted by courts and text writers: `If a decision has been made upon solemn and mature consideration, the presumption is in favor of its correctness, and the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions by it'"

(Emphasis added.) Recently we stated, "Judges adhering to the rule of stare decisis defer to prior precedent to obtain the beneficial effect of predictability in the law even when enticed to embrace what appears to be a more logically sound rule." Keck v. Dryvit Sys., Inc., 830 So.2d 1, 7-8 (Ala.2002). The State had the right to regard Romar as "a just declaration or exposition of the law, and to regulate [its] actions by it." Lindsay v. United States Savings & Loan Co., 120 Ala. at 167, 24 So. at 174. We therefore reject Exxon's invitation to overrule a principle of law exempting the State from the defense of the statute of limitations on its fraud counterclaim.
Exxon's first substantive argument regarding the fraud claim is that the State failed to present sufficient evidence of fraud to warrant submitting that issue to the jury; it maintains that all of the allegations made by the State equate to at most a breach of contract, not fraud. Exxon concludes that the trial court therefore erred in submitting the fraud question to the jury. Another of Exxon's arguments, regarding the admissibility of a letter written by Charles Broome to R.J. Kartzke in April 1993, directly affects whether the State presented sufficient evidence of fraud; therefore, we first address Exxon's *1103 argument as to the admission into evidence of that letter.
Exxon argues that the letter written by in-house counsel Charles Broome is protected by the attorney-client privilege pursuant to Rule 502, Ala. R. Evid., and that, therefore, it should not have been admitted into evidence at trial. "Whether a communication is privileged is a question of fact to be determined by the trial court from the evidence presented...." Ex parte DCH Reg'l Med. Ctr., 683 So.2d 409, 412 (Ala.1996). In order for the trial court's ruling on such an issue to be overturned, it must be shown that the trial court abused its discretion. Rule 502, Ala. R. Evid., states the requirements for an item of evidence to be considered privileged as a confidential communication between an attorney and the attorney's client. Rule 502(b) states, in pertinent part:
"A client has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client, (1) between the client or a representative of the client and the client's attorney or a representative of an attorney ...."
In 1993 Charles Broome was employed as an in-house attorney for Exxon; thus, Broome's "client" was Exxon. Corporations are entitled to the benefit of the attorney-client privilege because corporations are included in the definition of "client" in Rule 502(a). See, e.g., Upjohn Co. v. United States, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). That the letter was written "for the purpose of facilitating the rendition of professional legal services" to Exxon is plain from the testimony at trial. Exxon's accounting manager for the Mobile Bay project, R.J. Mertz, testified that he "requested a legal opinion pursuant to the mineral leases" from Broome. Broome testified that in the letter he "provided advice on [his] interpretation of [sections] 5(a) and 5(b) in the lease[-agreement] form and the other provisions in the lease." See, e.g., Ex parte Great American Surplus Lines Ins. Co., 540 So.2d 1357 (Ala.1989).
The content of the letter confirms Mertz's description of the letter as a "legal opinion." Broome first summarized what he believed to be the State's position as to the royalty provisions in the lease agreement and also the position of Shell Corporation with regard to these provisions.[1] Those summaries were followed by Broome's attempts to "harmonize" sections 5(a) and 5(b) of the lease-agreement form because of what Broome perceived to be contradictions between the two sections. He offered two possible interpretations to achieve harmonization, followed by an assessment of the legal consequences of underpaying royalties to the State. Broome concluded by giving specific advice as to how royalties should be paid on certain items produced in the oil-extraction process, given the language in the lease agreement. The letter clearly represents a communication of legal advice pertaining to the interpretation of a contract.
The major question in this case is whether the letter was a "confidential communication" between Broome and his client. Indeed, it appears that the trial court declared the letter admissible mainly on the basis of a waiver of confidentiality.
*1104 The trial court stated in part: "I don't think there's anything confidential about this. This is an information letter that is going out to people. To be honest with you, this probably went out to other companies as well." Thus, it is incumbent upon this Court to decide whether the trial court abused its discretion in declaring that the letter was not a "confidential" communication between the attorney and his client.
Rule 502(a)(5) states: "A communication is `confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional services to the client or those to whom disclosure is reasonably necessary for the transmission of the communication." The evidence must show that the letter was intended to be confidential in order to be protected by the privilege. Whether a party intended the communication to be confidential is dependent on who was privy to the legal advice. In Upjohn, the United States Supreme Court abandoned the "control-group" test for determining confidentiality in the corporate setting. The control-group test protected only those communications that were made to employees who had control or who were able to participate in the decision to which the legal advice pertained. 449 U.S. at 390, 101 S.Ct. 677. The United States Supreme Court rejected this test, stating:
"The control group test ... thus frustrates the very purpose of the privilege by discouraging the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation. The attorney's advice will also frequently be more significant to noncontrol group members than to those who officially sanction the advice, and the control group test makes it more difficult to convey full and frank legal advice to the employees who will put into effect the client corporation's policy."
449 U.S. at 392, 101 S.Ct. 677. Reflecting the fact that the scope of the privilege has been broadened beyond the control group, the Advisory Committee's Notes to Rule 502 state that "the communication may be made only between representatives of the client who are within the `control group' or whose duties are closely related to the matter about which the communication is made ...." (Emphasis added.)
Broome's letter was addressed to R.J. Kartzke, Exxon's Mobile Bay project manager. The face of the letter shows that copies were sent to Mertz, Exxon's accounting manager for the Mobile Bay project and the man who requested the legal opinion, and to R.G. Bremer, another accountant for Exxon on the Mobile Bay project. In an affidavit, D.C. Capobianco, the business operations support manager for the Southeastern Production Division, which includes Mobile Bay, affirmed that "at all times, Mr. Broome's legal advice was treated as confidential." Because Broome's advice dealt with the amount Exxon should pay the State in royalties according to the lease agreement, the accountants for the Mobile Bay project had duties "closely related to the matter about which the communication is made," and Kartzke was part of the decision-making group. Thus, the evidence in the record indicates that only those directly involved in the royalty-payment decision and the process of payment were privy to Broome's letter.
While Capobianco's affidavit is not evidence indicating that Broome's letter was treated as confidential by all who received it, it does provide some evidence of an intent not to disclose the communication to third parties other than those necessary to carry out Exxon's royalty-payment responsibilities. *1105 Moreover, Mertz testified in his deposition that legal opinions typically were "shared with senior management who makes the final decisions." Again, while this statement does not prove that this particular legal opinion was shared only with senior management who had decision-making authority and with those persons closely related to the topic addressed in the letter, it does provide evidence of the manner in which Exxon commonly treated legal opinions.
The above evidence, taken together, constitutes a prima facie showing that Broome's letter was intended to remain confidential. Contrary to the statement by the trial court, there is no evidence in the record indicating that the letter was seen by numerous people at Exxon, let alone by people at other companies. This prima facie showing of confidentiality by Exxon shifted the burden to the State to prove that the letter was not a confidential communication.
The only evidence presented by the State to show that the letter was not confidential is a stamp in the top-right corner of the letter; the stamp contains a date and the initials of several Exxon personnel, with boxes beside the initials. The State refers to the stamp as a "distribution list" detailing who received the letter, while Exxon refers to it as a "received" stamp, merely showing that Kartzke received the letter. If Exxon's interpretation of the stamp is accepted, then the stamp is proof only that Kartzke received the letter, because the boxes next to the initials are unmarked. If the State's interpretation of the stamp is accepted, i.e., that it is a distribution stamp, then because Exxon had already met its burden demonstrating the confidentiality of the letter, it was incumbent upon the State to demonstrate that Exxon had waived confidentiality by showing that the letter was received by the individuals whose initials are included on the stamp and that at least some of those individuals were not "client representatives" whose jobs were "closely related to" the issues discussed in the letter.
The State's only proof that the letter was given to the people listed on the stamp consisted of what it called "inferences" from the deposition testimony of Charles Broome. In that deposition, the State asked Broome a series of questions related to the initials appearing on the stamp that was imprinted on Broome's letter. The questions were similar for each set of initials on the stamp:
"Q. [State's attorney]: Who is DEB?
"A. [Broome]: That would have been Doug Baining who was the construction manager for the [Mobile Bay] project.
"Q. [State's attorney]: All right. Why is he getting the letter?
"A. [Broome]: Well, he is one of Kartzke's managers under Kartzke's supervision."
This line of questioning persisted in nearly identical fashion for each set of initials included on the stamp. The State's "inference" that Broome admitted through this testimony that each person whose initials were on the stamp received the letter represents an assumption on the part of the State, rather than proof that each person received the letter.
However, Exxon failed to object to the form of the questions at the time the deposition was taken; thus, it waived any objection for failure to prove the assumption underlying the questions. See Rule 32(d)(3)(B), Ala. R. Civ. P. Moreover, Broome failed to plead lack of knowledge as to whether those individuals had received the letter. Thus, we must accept Broome's deposition testimony as evidence indicating that each individual whose initials *1106 he was able to identify received the letter.
Even so, Broome's answers for each individual he was able to identify provided sufficient justification to satisfy those individuals' need to know the contents of the letter. Doug Baining was the construction manager for the Mobile Bay project; Robert Heinz was the financial manager for the Mobile Bay project; Harland Johnson was another project manager; Fred Terrell was the utilization manager for the Mobile Bay project; and Roger Koerner was the manager of the Southeastern Production Division and Kartzke's boss. All of these employees were directly connected to the Mobile Bay project, the subject of the letter, and represented part of the management of the project; they easily fit within the meaning of "client representatives."
As for the four sets of initials Broome could not identify, Broome did not provide testimony as to whether those individuals received the letter, and his lack of knowledge about the individuals, if anything, shows that those individuals did not receive the letter. In any event, it cannot be assumed that the individuals whose initials Broome could not identify received the letter, given Exxon's proof of confidentiality and the State's failure to provide any evidenceother than the stamp itselfthat those individuals received the letter. The stamp itself cannot serve as evidence of receipt for anyone other than Kartzke, given the lack of any markings next to initials to indicate receipt. Thus, the State failed to disprove Exxon's showing that the letter was intended to be, and indeed was, confidential. Moreover, the State failed to present any evidence indicating that the individuals whose initials were on the stamp, if they did receive the letter, were not "client representatives."
The State also argues that, even if the letter is considered confidential, Exxon waived the attorney-client privilege in three ways. First, it argues that the list of initials on the stamp constitutes a waiver of the privilege because, it says, it shows that the letter was distributed to people other than client representatives. For the reasons already discussed, this argument does not demonstrate that Exxon waived the privilege. Second, the State argues that certain documents, known as the "Condray documents,"[2] which Exxon does not claim to be privileged, contained the same information as the Broome letter, thereby rendering the Broome letter admissible.
However, although some of the information contained in the Broome letter is also contained in the Condray documents, and although Exxon personnel testified that the Broome letter was used in preparing the Condray documents for a presentation to Exxon executives, the Condray documents and the Broome letter do not contain the same information. Most obviously, the Condray documents do not contain Broome's opinion as to which interpretation harmonizing sections 5(a) and 5(b) of the lease agreement was the approach Exxon should take and why it should accept that approach. The Condray documents do not contain, as the Broome letter does, an assessment of the likelihood of success in court of each approach. Moreover, R.G. Bremer testified in deposition that the accountants' understanding of the Broome letter would have been included in the Condray documents, but that the Condray documents "would *1107 have been more item-specific." Again, this shows that the Condray documents and the Broome letter were sufficiently dissimilar so that the introduction into evidence of the Condray documents did not represent a waiver of the attorney-client privilege as to the Broome letter.
Moreover, while some of the information found in the Broome letter can also be found in the Condray documents, the admission of the Broome letter provided more than information alone to the jury. This point goes directly to whether the admission of the letter prejudiced Exxon. The admission of the Broome letter permitted the State to argue, as it did several times before the jury, that Exxon's own lawyer believed that its interpretation of the lease agreement concerning royalty payments "has little chance of being upheld." The State would not have been able to make this claim, which the State admitted in its posttrial brief "obviously resonated loudly with the jurors," had the Broome letter not been admitted.
Third, the State cursorily argues that any confidentiality was waived through the crime-fraud exception to the attorney-client privilege. The trial court summarily rejected this argument, because it did not believe that the letter itself evidenced fraud. The State argues nonetheless that the Broome letter qualifies for the crime-fraud exception to the attorney-client privilege because "it was instrumental in informing, guiding, and thereby furthering Exxon's fraud." State's Brief, p. 208 n. 160.
In support of this argument, the State cites In re Grand Jury Proceedings, 87 F.3d 377, 381 (9th Cir.1996), in which the United States Court of Appeals for the Ninth Circuit stated: "To trigger the crime-fraud exception, the government must establish that `the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme.' In re Sealed Case, 754 F.2d [395] at 399 [(D.C.Cir. 1985)] (citations omitted)." (Emphasis added.) The undisputed evidence before the trial court indicated that in the ordinary course of business R.J. Mertz asked for a legal opinion from Broome concerning the royalty provisions of the oil-and-gas lease agreements. The State presented no evidence indicating that the letter was requested in order to commit a fraud or to further a fraud upon the State. Even if we accepted the State's claim that the letter was subsequently used to "inform" or "guide" Exxon in committing fraud, it would not establish that Exxon "was engaged in fraud" at the time it requested the letter or that the letter was requested "to further the scheme" of the alleged fraud. See also, In re Grand Jury Investigation, 842 F.2d 1223, 1226 (11th Cir.1987).
As the Ninth Circuit Court of Appeals emphasized:

"[I]t isn't enough for the government merely to allege that it has a sneaking suspicion the client was engaging in or intending to engage in a crime or fraud when it consulted the attorney. A threshold that low could discourage many would-be clients from consulting an attorney about entirely legitimate legal dilemmas. Rather, the district court must find `reasonable cause to believe' that the attorney's services were `utilized ... in furtherance of the ongoing unlawful scheme.' In re Grand Jury Proceedings, 867 F.2d [539] at 541 [(9th Cir.1989) ]."

In re Grand Jury Proceedings, 87 F.3d at 381 (emphasis added). Because the State failed to present evidence indicating that Exxon, when it requested the letter, was using Broome's services to further an ongoing *1108 fraudulent scheme, the Broome letter does not qualify for the crime-fraud exception, and the trial court correctly rejected that argument.
Finally, the State argues that if the admission of the letter was erroneous, the error was harmless. However, the State's emphasis on the letter throughout the trial belies any claim of harmless error.[3] In its brief in support of its motion to compel production of the Broome letter and other documents, the State said: "To describe the `Broome letter' as a `smoking gun' is a monumental understatement. The Broome letter is the equivalent of a crystal clear video with sound of the assailant plunging a bloody knife into the victim's chest." The State highlighted the Broome letter in its opening statement to the jury; referred to the letter as "infamous" during the trial; used it in cross-examining several Exxon employees; and again referred to the letter in its closing statement.[4] No other document played such a central role in the State's fraud case, and through the statements of its attorneys at trial the State essentially admits that the admission of the letter prejudiced Exxon.
Because Exxon established that the Broome letter represented a confidential communication between an attorney and his client or client representatives and because the admission of the letter clearly prejudiced Exxon, the trial court committed reversible error in admitting the Broome letter into evidence. The letter was a legal opinion by an Exxon attorney prepared on behalf of Exxon pertaining to the very issues before the jury in this case. Consequently, the letter should not have been admitted.
We reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
SEE, LYONS, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
HOUSTON, J., concurs in part and dissents in part.
MOORE, C.J., and JOHNSTONE, J., dissent.
HOUSTON, Justice (concurring in part and dissenting in part).
I am persuaded that the State offered substantial evidence to prove its breach-of-contract *1109 claim and that the trial court did not err in submitting this claim to the trier of the facts. The jury returned the following verdict:
 "We the jury find, on the claim for breach of contract, as follows:
 OR
"x For the Plaintiff (State) and against the "___ For the Defendant (Exxon)
 Defendant as follows:

"a) Royalty Due for Fuel Used or $31,873,066.00
 _______________
 Unaccounted
"b) Royalty Due at the Price Received $30,077,199.00
 _______________
 Therefor or at the Best Price Realizable
 in the Exercise of Reasonable Diligence,
 Whichever is Higher
"c) Royalty Due on Improper Deductions $18,107,618.00
 --------------
 (cost netting)
"d) Royalty Due on Electrical Power Value $ 1,921,222.00
 ______________
"e) Royalty Due on Sulfur Production $ 4,987,475.00
 ______________
"f) Royalty Due on Condensate $ 726,115.00
 _______________
"g) Total Due: $87,692,695.00
 _______________

 "/s/ Jonathan S. Filligim
 "FOREPERSON"
(Emphasis added.)
In my opinion, the admission of the Broome letter into evidence was harmless error as to the breach-of-contract claim. I am aware of the casual mention of prejudice as to this claim in Exxon's brief; however, I am persuaded by the record that there was no prejudice as to this claim. The State presented substantial evidence in support of each element of the breach-of-contract claim, including substantial evidence of the amount of damages for each of the six species of damage for breach of contract. During the jury trial, Exxon did not refute the amount of damages for any of the six species of damage. The Broome letter could have had no bearing on whether Exxon breached its contract with the State. I would affirm the $87,692,695 judgment based upon the jury verdict on the breach-of-contract claim.
The jury entered a separate verdict on the claims alleging fraud, deceit, and misrepresentation.
 "We the jury find, on the claim for fraud, deceit, and misrepresentation as follows:
 OR
"x For the Plaintiff (State) and against "___For the Defendant (Exxon)
 the Defendant and assess the punitive
 damages as $3,420,000,000.00
 "/s/ Jonathan S. Filligim
 "FOREPERSON"
For the reasons stated in the per curiam opinion, I would reverse the judgment entered on the jury verdict for "fraud, deceit, and misrepresentation" and remand the *1110 case. Therefore, it is not necessary for me to determine whether there was clear and convincing evidence of fraud, deceit, and misrepresentation, with the Broome letter before the trier of the facts. The majority opinion correctly asserts that "[n]o other document played such a central role in the State's fraud case." It would be improper for me to speculate as to whether the State can prove the cause of action for fraud, deceit, and misrepresentation by clear and convincing evidence, without the Broome letter.
I concur in part and dissent in part.
MOORE, Chief Justice (dissenting).
I must respectfully dissent from the majority's conclusion that the trial court's admission of the letter written by Exxon attorney Charles Broome constitutes reversible error.
"Whether a communication by a client to his attorney is privileged is a question of fact to be determined by the court." Ex parte Griffith, 278 Ala. 344, 350, 178 So.2d 169, 176 (1965). Therefore, in reviewing the trial court's decision to admit the letter, we apply an abuse-of-discretion standard. See Ex parte Clark, 630 So.2d 493, 496 (Ala.Crim.App.1993). The Advisory Committee's Notes to Rule 502, Ala. R. Evid., express concern that the extension of the attorney-client privilege to client representatives in Rule 502(b)(4) could be abused:
"Because an overbroad application of subsection (b)(4) could lead to abuse in a corporate or business setting, the committee feels it necessary to restate the following safeguards: the burden is upon the party asserting the privilege to prove it; the privilege is to be strictly applied, because it is in derogation of the search for the truth; the judge has the responsibility for determining if the privilege applies and should not normally decide the question based solely upon the fact that the client asserts it; the communication may be made only between representatives of the client who are within the `control group' or whose duties are closely related to the matter about which the communication is made; the claimant must prove that the communication was treated within the corporation as confidential; and the person claiming the privilege must show that the communication was made `for the purpose of effecting legal representation for the client.'"
(Emphasis added.)
Exxon had the burden of proving that "the communication was treated within the corporation as confidential" by showing that the Broome letter was distributed only to those within the corporation "whose duties are closely related to the matter about which the communication is made." I do not believe Exxon met its burden in this regard. Exxon admitted that R.J. Kartzke, R.J. Mertz, R.G. Bremer, and D.C. Capobianco received the letter; however, several other names are listed in the stamp that appears on the letter. Exxon did not show whether those persons received the letter, nor did Exxon explain in any detail why any of those people would be considered a "client representative." That Capobianco, who is not listed anywhere on the Broome letter and whose initials are not on the stamp, also received it raises further questions about who else might have received the communication now determined to be confidential. In short, the evidence presented by Exxon to demonstrate confidentiality was insufficient to warrant this Court's holding that as a matter of law the trial court abused its discretion in admitting the letter into evidence.
I also agree with Justice Houston that the State presented substantial evidence on the breach-of-contract claim that Exxon *1111 did not challenge and that the jury's verdict on that issue should be upheld. The Broome letter discusses different possible interpretations of the royalty provisions of the lease agreement, the reasonableness of those interpretations, and the chance of success in litigation of each interpretation, but it does not determine Exxon's liability for a breach of contract. The reasonableness of a contractual interpretation is not relevant to a breach-of-contract claim. Therefore, the Broome letter should have had little, if any, effect on the jury's determination of Exxon's liability for breach of contract.
For these reasons, I dissent.
JOHNSTONE, Justice (dissenting).
For two reasons, I respectfully dissent. The first reason is that the record contains sufficient evidence to support the conclusion that the Broome letter fits the fraud exception to the attorney-client privilege. The second reason is that Exxon failed to carry its initial burden of proving that Exxon itself maintained whatever confidentiality the Broome letter otherwise may have been due.
My analysis of the fraud-exception issue is factually based particularly on the Broome letter itself, on the lease form common to all of the pertinent leases, and on three prior in-house legal-analysis letters written by Exxon lawyers. These three prior letters were provided to the trial court for in camera review before it made its rulings that the Broome letter was discoverable and that it was admissible. The first prior letter is dated March 6, 1981, written by Susan S. Smith, and addressed to Mr. L. Bruce Bowen. The second is dated August 7, 1984, written by Joseph T. Rauls, and addressed to Denise Sebastian. The third is dated January 16, 1987, written by Kenneth R. Carretta, and addressed to Ms. T.R. Hebert and Mr.
C.C. Broome. The most significant aspect of the Carretta letter is the memo to file which is attached to the letter. The memo to file, dated January 12, 1987, is Mr. Carretta's own legal analysis of the lease form.
The attorney-client privilege is stated in Rule 502, Ala. R. Evid. Likewise, the fraud exception is stated in subparagraph (d)(1) of that rule:
"(d) Exceptions. There is no privilege under this rule:
"(1) Furtherance of Crime or Fraud. If the services of the attorney were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud."
Included within the fraud exception is an attorney's communication which is itself a part of a plan to commit a fraud. Sawyer v. Stanley, 241 Ala. 39, 1 So.2d 21 (1941).
The substance of the lease and the substance of each one of the letters by lawyers, including the Broome letter, is all-important. The substance of the Broome letter in this context supports a fair inference that the letter itself is a part of a plan to defraud the State of Alabama. The most damning paragraph of the Broome letter, in context, is the one under the heading, "Severely Limiting 5(b)." This paragraph is expressly presented as, "A more extreme construction." It is extreme indeed.
The "more extreme construction" in the Broome letter suggests, in essence, that a broad range of expenses may be deducted from the basis for computing the royalties on all gas produced pursuant to the leases, even though the lease document expressly and meticulously limits the applicability of deductions to two categories of gas produced pursuant to the leases and used (not sold) by Exxon and even though the lease *1112 limits the scope of even these deductions. Broome's "more extreme construction" flouts the express provisions of the lease, flouts the limits and caveats of the three prior legal-analysis letters, and even flouts the caveat in Broome's very own letter, in the paragraph headed "The Shell Approach," stating, "I am not able to find much support for extending [a particular deduction provision in the lease] to treating operations."
The record contains evidence that Exxon was ready, willing, and able to take advantage of the inexperienced staff at the Department of Conservation and Natural Resources. The record likewise contains super-abundant evidence that Exxon was intent on deducting every expense it could risk deducting. The paragraph in Broome's letter headed "Consequences of Underpayment" states the risk in very affordable terms. This paragraph and the "more extreme construction" paragraph, in the context of the text of the lease, the prior legal-analysis letters, and the corporate mindset of Exxon, constitute an invitation for Exxon to take deductions that cannot possibly be legitimately reconciled with the provisions of the lease; and Exxon did, in fact, take millions of dollars in such deductions. See, e.g., (testimony of Robert Bremen, R. 1068, 1077-88, 1090-98, 1101-06, 1111-24, 1126-28, 1132-34).
"[T]he privilege `protecting communications between an attorney and client is lost if the relation is abused, as where the client seeks advice that will serve him in the commission of a fraud.' Such is the rule that obtains in the instant case....
"It may be said further that the reason most frequently advanced for this exception to the rule of privileged communications is that there is no professional employment, properly speaking, in such cases. Standard F. Ins. Co. v. Smithhart, 1919, 183 Ky. 679, 211 S.W. 441, 5 A.L.R. 972; Cummings v. Com., 1927, 221 Ky. 301, 298 S.W. 943; Strong v. Abner, 1937, 268 Ky. 502, 105 S.W.2d 599; People v. Van Alstine, 1885, 57 Mich. 69, 23 N.W. 594; Hamil & Co. v. England, 1892, 50 Mo.App. 338; Carney v. United R. Co., 1920, 205 Mo.App. 495, 226 S.W. 308; Matthews v. Hoagland, 1891, 48 N.J.Eq. 455, 21 A. 1054; Coveney v. Tannahill, 1841, 1 Hill, N.Y., 33, 37 Am.Dec. 287; People v. Warden, 1934, 150 Misc. 714, 270 N.Y.S. 362; Id., 242 App.Div. 611, 271 N.Y.S. 1059; Russell v. Jackson, (1851) 9 Hare 387, 68 Eng. Reprint 558; Charleston v. Coombes (1863) 4 Giff. 372, 66 Eng. Reprint 751; Reg v. Cox [1884] LR. 14 QB. Div. (Eng.) 153-CCR; Re. Postlethwaite [1887] LR. 35 Ch.Div. (Eng.) 722.
"In Reg. v. Cox, supra, the court said, `In order that the rule may apply, there must be both professional confidence and professional employment, but if the client has a criminal object in view in his communications with his solicitor one of these elements must necessarily be absent. The client must either conspire with his solicitor or deceive him. If his criminal object is avowed, the client does not consult his adviser professionally, because it cannot be the solicitor's business to further any criminal object. If the client does not avow his object, he reposes no confidence, for the state of facts which is the foundation of the supposed confidence does not exist. The solicitor's advice is obtained by fraud.'
"So, in Strong v. Abner, 268 Ky. 502, 105 S.W.2d 599, 602, the court said: `* * * The protection which the law affords to communications between attorney and client, has reference to those which are legitimately and properly within the scope of a lawful employment. It does not extend to communications made in contemplation of * * * a crime, *1113 or perpetration of a fraud.' See also Standard F. Ins. Co. v. Smithhart, 183 Ky. 679, 211 S.W. 441, 5 A.L.R. 972.
"The Michigan court in People v. Van Alstine, 57 Mich. 69, 23 N.W. 594, 598, in holding not privileged communications to an attorney having for their object the commission of a crime, said: `They then partake of the nature of a conspiracy, or attempted conspiracy, and it is not only lawful to divulge such communications, but under certain circumstances it might become the duty of the attorney to do so. The interests of public justice require that no such shield from merited exposure shall be interposed to protect a person who takes counsel how he can safely commit a crime. The relation of attorney and client cannot exist for the purpose of counsel in concocting crimes.'
"In Charlton v. Coombes (1863) 4 Giff. 372, 66 Eng. Reprint 751, the English court said: `The court cannot permit it to be said that the contriving a fraud forms part of the professional business of an attorney or solicitor.'"
Sawyer, 241 Ala. at 45-46, 1 So.2d at 26-27. In Alabama, the attorney-client privilege includes not only legitimate communications by the client to the attorney but also legitimate legal advice by the attorney to the client. § 12-21-161, Ala.Code 1975; and Advisory Committee's Notes to Rule 502(b), Ala. R. Evid. In the case now before us, however, Broome's advice to Exxon is not "part of the professional business of an attorney." Sawyer, 241 Ala. at 46, 1 So.2d at 27. Therefore, it is not within the ambit of the privilege.
Exxon seems to argue that the Broome letter prejudiced the defense by implying that its interpretation of the lease was inaccurate. While the Broome letter may support that inference, the Broome letter also supports the equal and not inconsistent inference that Broome was an enthusiastic team player tempting a team that would appreciate the temptation to break the rules to gain some yardage. This latter inference justifies the decisions by the trial court first to permit discovery of the Broome letter and second to admit it into evidence. The appellate courts will affirm the trial court if it is right for any reason developed in and supported by the recordeven a reason rejected by the trial court. Ex parte Ryals, 773 So.2d 1011, 1013 (Ala.2000).
My second reason for dissenting is that the very evidence of record needed by Exxon for its own prima facie showing to claim the attorney-client privilege includes or entails substantial evidence that Exxon itself destroyed any confidentiality in the Broome letter by revealing it to third parties not proved to participate in the payment of royalties or in decisions about the payment of royalties or in the transmission of information for such decisions or payments. The attorney-client privilege is lost if the ostensibly privileged communication is "disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional services to the client or those to whom disclosure is reasonably necessary for the transmission of the communication." Rule 502(a)(5), Ala. R. Evid.; Advisory Committee's Notes, Rule 502; C. Gamble, McElroy's Alabama Evidence § 388.02(4) (5th ed.1996).
The date-and-distribution stamp on the Broome letter bears, as part of the stamp itself, the initials of ten prospective recipients other than the addressee R.J. Kartzke. A copy notation typed at the end of the letter indicates that it was distributed to R.J. Mertz, whose initials appear among the ten sets in the date-and-distribution stamp. Broome's own deposition testimony may be interpreted reasonably as an *1114 admission that the letter was distributed also to Fred Terrell and Roger Koerner, whose respective initials too appear among the ten sets in the date-and-distribution stamp. No markings appear alongside the initials of these three men in the stamp or appear anywhere else in or on the stamp to suggest any different treatment of or among any of the ten persons whose initials appear there. That is, the stamp and the other evidence support the inference that the seven persons whose initials appear just as the initials of Mertz, Terrell, and Koerner appear in the stamp, received the letter just as Mertz, Terrell, and Koerner received it. No evidence of record tends to prove that any of the ten except for Mertz participated in the payment of royalties, the decisions about the payments, or the transmission of information necessary to such decisions.
The burden is on a corporation claiming the attorney-client privilege to "prove that the communication was treated within the corporation as confidential" and "that the communication was made `for the purpose of effecting legal representation for the client.'" Advisory Committee's Notes, Rule 502(b). D.C. Capobianco's affidavit, including its entirely conclusionary statement that, "[a]t all times, Mr. Broome's legal advice was treated as confidential," does not, by itself, suffice as a prima facie showing by Exxon that the Broome letter was an attorney-client communication which "was treated within the corporation as confidential." The Broome letter itself was necessary to the prima facie showing. Yet the Broome letter, bearing as it does the date-and-distribution stamp, which, in turn, requires at least what explanation Broome supplied in his deposition, detracts from a prima facie showing as much as or more than the letter, together with the stamp and the deposition testimony, adds to a primary facie showing. The particularized evidence that the Broome letter was distributed to nine third parties not established as "those to whom disclosure is made in furtherance of the rendition of professional services to the client or those to whom disclosure is reasonably necessary for the transmission of the communication," Rule 502(a)(5), detracts from the efficacy of the conclusionary statement in D.C. Capobianco's affidavit that, "[a]t all times, Mr. Broome's legal advice was treated as confidential." Thus, the trial court cannot be faulted for refusing to accept the showing by Exxon.
I respectfully submit that the trial court did not err in admitting the Broome letter. We should not reverse on the issue of liability.

On Application For Rehearing
PER CURIAM.
APPLICATION OVERRULED.
SEE, LYONS, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
MOORE, C.J., and HOUSTON and JOHNSTONE, JJ., dissent.
HOUSTON, Justice (dissenting).
I dissent from overruling the application for rehearing. I would grant the application for rehearing, affirm the judgment on the contract count, and affirm the declaratory judgment.
NOTES
[1] At the time Broome wrote the letter, the State was auditing Shell Corporation concerning its payment of oil royalties under the same form lease agreement. Thus, Shell Corporation had formulated its own ideas as to the meaning of the royalty provisions of the form lease agreement.
[2] The "Condray documents" consist of papers used in a 1993 presentation to Exxon's senior vice president, Ansel Condray, by Exxon employees, on royalty payments for the Mobile Bay Project.
[3] The Court takes Justice Houston's point in his special writing to be that Exxon failed to challenge during the trial the State's evidence concerning the amount of compensatory damages, and therefore the admission of the Broome letter was harmless error with regard to the State's breach-of-contract claim. While it may be true that the amount of damages was not challenged, Exxon certainly contested the issue of liability on the breach-of-contract claim. The Broome letter directly discusses Exxon's liability for royalty payments due the State. Thus, its admission cannot be considered harmless error with regard to the jury's determination of liability on the breach-of-contract claim. This Court has previously held that the admission of information protected by the attorney-client privilege that speaks to the issue of the defendant's liability would be "highly prejudicial" and should not, therefore, be admitted. See Melco Sys. v. Receivers of Trans-America Ins. Co., 268 Ala. 152, 105 So.2d 43, 52 (1958). We find the same to be true in this case.
[4] In its closing, the State told the jury: "You've got the Broome ... letter that says [Exxon's] got little chance of winning, but what have we got to lose other than giving the money back." In discussing awarding punitive damages, the State told the jury: "If you go back there and you don't award punitive damages, you're going to be patting Charles Broome on the back and saying you were right; all we made you do was give back the $87 million including interest, which is what he said you would do."